**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| ABDULKADIR SHARIF ALI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:26CV257 |
| | ) | |
| JEFFREY CARROLL, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the undersigned United States Magistrate Judge for a review of Plaintiff's Proposed Amended Complaint (Docket Entry 15-1) under 28 U.S.C. § 1915(e)(2)(B). (See Text Order dated Oct. 15, 2026 (finding as moot Plaintiff's Motion for Leave to Amend Complaint and Add Defendants under Federal Rule of Civil Procedure 15(a)(1) and deferring review required by Section 1915(e)(2)(B)).) For the reasons that follow, the Court should deem the Proposed Amended Complaint as Plaintiff's operative pleading and should dismiss the claims therein for "[d]eliberate indifference against [Christina M.] Guin" (Docket Entry 15-1 at 11),[1] for "[c]onversion against [Jeffrey L.] Carroll" (id. at 12), and for "[c]ommon-law obstruction of justice against [Teresa S.] Turner, [Benjamin M.] Anderson, [Mercedes] Fordham, and [Tonia] Warnic" (id. at 13), because they fail to state a claim.

---

1 Quotations from Plaintiff's filings omit bold font.

## INTRODUCTION

Plaintiff – while a "[c]onvicted and sentenced state prisoner" (Docket Entry 2 at 4) – commenced this action by filing a Declaration and Request to Proceed In Forma Pauperis (Docket Entry 1 ("IFP Application")) and a Complaint (Docket Entry 2; see also Docket Entry 3 ("Plaintiff's Affidavit")).[2] The Complaint relies on 42 U.S.C. § 1983 as the "Basis for Jurisdiction" (Docket Entry 2 at 3) and seeks relief from Defendants Carroll, Turner, David Waller, and Anderson (see id. at 2-3 (listing Defendants)), for "events [that] happened at Piedmont Correctional Institution, . . . in the inmate receiving/vehicle sallyport, under direct view of the camera" (id. at 4), on "March 10th, 2025 at approximately between 4:00 a.m. - 6:00 a.m." (id. at 5). Upon review of the IFP Application, Complaint, and Plaintiff's Affidavit (see Docket Entry dated Mar. 20, 2026 (referring case for screening)), the undersigned Magistrate Judge (A) "permitted [Plaintiff] to file and prosecute [this] action in this Court without prepayment of fees . . ., subject to [certain] conditions" (Docket Entry 4 at 5; see also id. at 5-6 (requiring initial partial payment and future payments from Plaintiff's prison account)), and (B) "recommended that [the] individual capacity claims against Defendants Carroll and Waller [for excessive force and failure to intervene] be

---

2 Plaintiff subsequently "was released from incarceration on July 11, 2026." (Docket Entry 13 at 1.)

allowed to proceed, but that all other claims be dismissed . . . for failing to state a claim . . . or for seeking [] monetary damages from [D]efendants with immunity" (id. at 5 (all-caps font omitted); see also id. at 3 (explaining that Plaintiff's official capacity claims against Defendants ran afoul of Eleventh Amendment bar), 4-5 (concluding that allegations against Defendants Anderson and Turner for "destroying camera footage of [Defendant Carroll's excessive force] in violation of state policies concerning the preservation of such evidence" did not "state any claim")). The Court (per now-Chief United States District Judge David A. Bragdon) adopted that recommendation with a modification to permit Plaintiff to pursue a claim against Defendants Anderson and Turner for "the North Carolina common law offense of obstruction of justice" (Docket Entry 6 at 1) based on his allegation that they "intentionally destroyed camera footage of th[is] incident, [as such conduct] would impede and hinder this action" (id. at 2).

After Defendants Carroll, Waller, and Anderson waived service (see Docket Entry 9), they answered on October 26, 2026 (see Docket Entry 19). On October 21, 2026, the Clerk issued a Summons for Defendant Turner (see Docket Entry 17), but the Docket shows neither service of process on nor any responsive filing from her (see Docket Entries dated Oct. 21, 2026, to present). Meanwhile, on October 13, 2026, Plaintiff filed a Motion for Leave to Amend Complaint and Add Defendants (Docket Entry 15 ("Amendment

Motion”)), along with the Proposed Amended Complaint (Docket Entry 15-1). The Court (per the undersigned Magistrate Judge) found the Amendment Motion “moot” (Text Order dated Oct. 15, 2026), given that, “[a]t th[at] stage in the proceedings, Plaintiff [could] amend his pleading as of right without a court order under Federal Rule of Civil Procedure 15(a)(1)” (id.). However, “[b]ecause any amended complaint filed by Plaintiff as of right still would require screening under [Section] 1915(e)(2)(B), th[at Text Order promised] . . . review [of the] Proposed Amended Complaint and [] ent[ry of] appropriate orders when time permits.” (Id.)

DISCUSSION

“Because Plaintiff proceeds in forma pauperis, this [C]ourt is obligated to screen the [Proposed A]mended [C]omplaint for sufficiency.” Sloan v. Moore, Civ. Action No. 23-527, 2023 WL 3726919, at *1 (D. Md. May 30, 2023) (unpublished) (italics omitted); see also, e.g., Jamison v. Clarke, No. 7:18CV504, 2020 WL 618838, at *2 (W.D. Va. Feb. 10, 2020) (unpublished) (“[B]ecause [the plaintiff] is proceeding in forma pauperis, and any amended complaint is therefore subject to screening, the court reviews his claims to determine whether they should be permitted to go forward in this lawsuit.” (italics omitted)); Brumfield v. Goodyear Tire & Rubber Co., No. 3:15CV14127, 2016 WL 1254627, at *4 (S.D. W. Va. Mar. 11, 2016) (unpublished) (“[The plaintiff’]s application to proceed in forma pauperis against [one defendant] was granted;

however, [the plaintiff] now wishes to proceed in forma pauperis on his amended complaint against [five other d]efendants . . . . Thus his amended complaint will be examined under . . . the screening provisions of [Section] 1915(e)(2)(B)." (italics omitted)), recommendation adopted, 2016 WL 1267803 (S.D. W. Va. Mar. 30, 2016) (unpublished). "[T]he statutorily required screening of Plaintiff's [Proposed] Amended Complaint under [Section] 1915(e)(2)(B) . . . obligate[s this C]ourt[] to dismiss any portion of [his Proposed Amended C]omplaint that fails to state a claim upon which relief may be granted . . . ." Johnson v. Longe, No. 4:25CV9753, 2025 WL 3546292, at *1 (D.S.C. Dec. 10, 2025) (unpublished) (emphasis added); see also, e.g., Allen v. Whiskey Kitchen, No. 5:21CV293, 2022 WL 2651841, at *1 (E.D.N.C. July 8, 2022) (unpublished) (ruling that, where the plaintiff proceeds as a pauper, "[a] court may dismiss all or any part of a complaint which fails to state a claim upon which relief can be granted"); Firewalker-Fields v. Hill, No. 1:19CV626, 2021 WL 3216464, at *2 (E.D. Va. July 28, 2021) (unpublished) ("[W]here, as here, a plaintiff is proceeding in forma pauperis, a district court may dismiss an action – in whole or in part – when it determines the plaintiff has failed to state a claim for relief." (underscoring omitted)); 28 U.S.C. § 1915(e)(2) (providing for dismissal "at any time if the court determines that . . . (B) the action . . . fails to state a claim on which relief may be granted").

To avoid dismissal for failure to state a claim, "[P]laintiff must plausibly allege facts that, if proven, would be sufficient to establish each element of [his] claim[s]." Harvey v. Cable News Network, Inc., 48 F.4th 257, 269 (4th Cir. 2022) (emphasis added); see also Brunson v. Stein, 116 F.4th 301, 306 (4th Cir. 2024) ("A cause of action is the group of operative facts – also known as elements – giving rise to one or more bases for suing." (internal quotation marks omitted)). "Th[is] plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal citation and quotation marks omitted). In applying the plausibility standard, the Court "must accept the factual allegations in the [Proposed Amended C]omplaint and must construe those facts in the light most favorable to [] Plaintiff[]," Flood v. New Hanover Cnty., 125 F.3d 249, 251 (4th Cir. 1997) (emphasis added), but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," Iqbal, 556 U.S. at 678; see also id. ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). "If [ P]laintiff fail[ed] to plead a required element [of a] claim . . ., the appropriate remedy is dismissal for

failure to state a claim." Brunson, 116 F.4th at 307; see also id. at 309 ("[W]ithout a cause of action, a plaintiff has no claim upon which relief may be granted.").

Here, the Proposed Amended Complaint:

1) retains Plaintiff's Section 1983 claims under the Eighth Amendment for excessive force against Defendant Carroll and failure to intervene against Defendant Waller (see Docket Entry 15-1 at 10), and adds claims under North Carolina law for "[a]ssault and battery against [Defendant] Carroll" (id. at 11) and for "[i]ntentional infliction of emotional distress against [Defendant] Carroll" (id. at 12), premised on the same, basic allegations of excessive force (compare id. at 10, with id. at 11-12);

2) adds a Section 1983 claim under the Eighth Amendment for "[d]elberate indifference against [Defendant] Guin" (id. at 11), for "consciously disregard[ing Plaintiff's serious medical needs after Defendant Carroll's alleged use of excessive force] by dismissing [Plaintiff's reported] symptoms based on normal vital signs and directing [him to follow up with a] routine sick call without adequate further evaluation or treatment" (id.);

3) adds a claim under North Carolina law for "[c]onversion against [Defendant] Carroll" (id. at 12), based on the "alleg[ation that Defendant] Carroll intentionally exercised unauthorized control by withholding [Plaintiff's] property from [his prison] transfer [contemporaneously with the use of excessive force]

despite Plaintiff's request and asserted right to retain it, excluding Plaintiff from possession" (id.); and

4) extends Plaintiff's claim(s) under North Carolina law for "[c]ommon-law obstruction of justice against [Defendants] Turner[ and] Anderson[ to include Defendants] Fordham[] and Warnic" (id. at 13; see also id. ("maintain[ing] the individual-capacity obstruction claims against [Defendants] Turner and Anderson allowed to proceed in [Docket Entry] 6 and . . . add[ing Defendants] Fordham and Warnic on this same state-law theory")).

As shown in the discussion that follows, the Proposed Amended Complaint alleges facts sufficient to support the claims in the first grouping above, but fails to "plausibly allege facts that, if proven, would be sufficient to establish each element of the [other, above-listed] claim[s]," Harvey, 48 F.4th at 269.[3]

Excessive Force-Related Claims

The Proposed Amended Complaint alleges that, "[o]n March 10, 2023" (Docket Entry 15-1 at 2), during "Plaintiff['s ] transfer[] from Piedmont [Correctional Institution] to Johnston [Correctional Institution]" (id.), while "handcuffed, waist-chained, and in leg irons" (id. at 3), he inquired "about [his] property [Defendant] Carroll was leaving behind" (id.) and Defendant Carroll responded by "grabb[ing] Plaintiff by the neck, chok[ing] him, and dragg[ing]

3 Plaintiff appended a declaration to the Proposed Amended Complaint but the averments therein do not materially differ from the allegations of the Proposed Amended Complaint. (Compare Docket Entry 15-1 at 1-16, with id. at 17-29.)

him by the neck into the van" (id.), despite the fact that he "was not resisting, pulling away, refusing an order to enter [the van], or threatening anyone" (id.). According to the Proposed Amended Complaint, "[i]mmediately before th[at use of] force, [Defendant] Waller was a few feet away with an unobstructed view." (Id.) Those allegations generally mirror the allegations Plaintiff made in support of the Complaint. (See Docket Entry 3 at 2-6; see also Docket Entry 2 at 5 (incorporating allegations in Docket Entry 3 as "facts underlying [Plaintiff's] claim(s)").) The Court (per now-Chief Judge Bragdon) previously adopted the recommended conclusion that those allegations sufficed to show that Defendant Carroll "used excessive force" (Docket Entry 4 at 3) and that Defendant Waller "was in a position to prevent or stop the attack, but failed to do so" (id. at 3-4), such that Plaintiff "appear[ed] to state claims for relief . . . [that] can proceed" (id. at 4). (See Docket Entry 6 at 2 (adopting said recommendation).)

That conclusion remains applicable to the Proposed Amended Complaint's restated Section 1983 claims against Defendants Carroll and Waller. See Alexander v. Connor, 105 F.4th 174, 182 (4th Cir. 2024) (explaining that Eighth Amendment's "prohibition against cruel and unusual punishments includes the use of excessive force against a prisoner" defined to apply where both "the force applied was sufficiently serious," i.e., "nontrivial," and the defendant "acted with a sufficiently culpable state of mind," i.e., not "in

a good faith effort to maintain or restore discipline" but "for the very purpose of causing harm" (internal citation and quotation marks omitted)); Thompson v. Virginia, 878 F.3d 89, 107 (4th Cir. 2017) (holding that Cruel and Unusual Punishments Clause bars official's "deliberate indifference" to "substantial risk that [prisoner] would suffer serious harm," including "fail[ure] to intervene to stop [another official's] unlawful use of force"); see also Jones v. Mississippi, 593 U.S. 98, 105 (2021) ("[T]he Fourteenth Amendment incorporates the Cruel and Unusual Punishments Clause against the States."); Gonzaga Univ. v. Doe, 536 U.S. 273, 283 (2002) ("Section 1983 provides a remedy . . . for the deprivation of rights, privileges, or immunities secured by the Constitution . . . ." (internal quotation marks omitted)).

Plaintiff's claims for assault and battery and for intentional infliction of emotional distress ("IIED") rely on the same allegations of excessive force as does his claim against Defendant Carroll under Section 1983. (See Docket Entry 15-1 at 11 (supporting claim for assault and battery by "incorporat[ing use-of-]force allegations"), 12 (supporting IIED claim by "incorporat[ing] the facts about choking while fully restrained"); see also id. at 5 (alleging that, after use of force, "Plaintiff sought mental-health services" and "[h]is preexisting nightmares became more intense and frequent"), 12 (alleging that use of force "caused severe distress, including worsening preexisting symptoms

for which [Plaintiff] sought mental-health treatment”).) Under North Carolina law,[4] “a civil action for damages for assault and battery is available at common law against one who, for the accomplishment of a legitimate purpose, . . . uses force which is excessive under the given circumstances.” Myrick v. Cooley, 91 N.C. App. 209, 215, 371 S.E.2d 492, 496 (1988). Hence, Plaintiff’s “parallel state law claim of assault and battery is subsumed within the federal excessive force claim and [should] go[] forward as well.” Rowland v. Perry, 41 F.3d 167, 174 (4th Cir. 1994).

As to the IIED claim, “[t]his tort, under [North Carolina law], consists of: (1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress

---

4 This Court possesses “[p]endent jurisdiction [over a claim under state law] . . . whenever there is a claim arising under the Constitution[ and l]aws of the United States . . . and the relationship between that claim and the state claim permits the conclusion that the entire action before the [C]ourt comprises but one constitutional case.” United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966) (internal parentheses and quotation marks omitted); see also Shanaghan v. Cahill, 58 F.3d 106, 109 (4th Cir. 1995) (discussing codification of “pendent jurisdiction” as “supplemental jurisdiction” in 28 U.S.C. § 1367). “Federal courts, when exercising . . . [such] jurisdiction over state law claims, must[,] of course, apply the choice of law rules applicable in the forum state.” ITCO Corp. v. Michelin Tire Corp., Com. Div., 722 F.2d 42, 49 n.11 (4th Cir. 1983). For Plaintiff’s claims under state law, this Court, “then, would be bound to look to the choice of law rules applicable in North Carolina’s state courts.” Id. In relation to torts, the North Carolina Supreme Court has “observed that ‘[a] claimant’s right to recover and the amount which may be recovered for personal injuries must be determined by the law of the state where the injuries were sustained . . . .’” Id. (quoting Shaw v. Lee, 258 N.C. 609, 610, 129 S.E.2d 288, 289 (1963)). “[T]he injuries [allegedly] sustained by [Plaintiff] . . . were sustained in the state of North Carolina.” Id. “North Carolina’s law on [Plaintiff’s tort claims], accordingly, would apply.” Id.

to another," Dickens v. Puryear, 302 N.C. 437, 452, 276 S.E.2d 325, 335 (1981), and "may also exist where [the] defendant's actions indicate a reckless indifference to the likelihood that they will cause severe emotional distress," id. "[An] assault or [a] battery . . . may amount to extreme and outrageous conduct which is intended to cause and which does cause severe emotional distress." Holloway v. Wachovia Bank & Tr. Co., 339 N.C. 338, 354, 452 S.E.2d 233, 242 (1994). And neighboring federal courts addressing IIED claims under North Carolina law (A) have described "[e]xamples of 'outrageous conduct' [to] include[] excessive force used by a police officer," Fisher v. Walgreen, Co., No. 1:17CV225, 2018 WL 3750969, at *9 (W.D.N.C. Apr. 23, 2018) (unpublished), aff'd and adopted, 2018 WL 3744016 (W.D.N.C. Aug. 6, 2018), appeal dismissed and remanded, 758 F. App'x 263 (4th Cir. 2019), adhered to on remand, 2019 WL 1440320 (W.D.N.C. Mar. 29, 2019) (unpublished), aff'd, 780 F. App'x 61 (4th Cir. 2019), and (B) have found "claims of depression, anxiety, insomnia, and phobia of law enforcement officers," Russ v. Causey, 732 F. Supp. 2d 589, 606 (E.D.N.C. 2010), aff'd in relevant part, 468 F. App'x 267 (4th Cir. 2012), "sufficient [] to satisfy the [severe emotional distress] element of [an IIED] claim," id. at 607. Consistent with that authority, the Court should conclude that "[P]laintiff['s IIED] claim[] . . . do[es] not fail as a matter of law," id. at 608 (emphasis added).

## Medical Care Claim

Next, the Proposed Amended Complaint asserts a Section 1983 claim under the Eighth Amendment for "[d]eliberate indifference against [Defendant] Guin" (Docket Entry 15-1 at 11), the "LPN who evaluated Plaintiff [upon his arrival] at Johnston [Correctional Institution]" (id. at 2), for "consciously disregard[ing his medical needs] by dismissing [his] symptoms based on normal vital signs and directing [follow-up by] routine sick call without adequate further evaluation or treatment" (id. at 11). To support that claim, the Proposed Amended Complaint alleges these facts:

1) "[Plaintiff] told [Defendant Guin] that he had been choked and had a throat lump, pain, and difficulty breathing and swallowing" (id. at 4);

2) "[Defendant] Guin took vital signs and repeatedly told [Plaintiff] that nothing was wrong because the vitals were normal and it was not a loss-of-life-or-limb situation" (id.);

3) "[Defendant Guin's] clinical record documents an examination and acute pain, with stable vital signs and no visible injuries" (id.; see also id. ("Plaintiff does not recall whether [Defendant] Guin touched or examined his throat or neck and does not allege that no examination whatsoever occurred.")); and

4) "[Defendant Guin] advised non-aspirin and ibuprofen and a sick-call request rather than arranging further urgent evaluation" (id.).

With those allegations, Plaintiff "did not state a claim of deliberate indifference to his serious medical needs, as prisoners' Eighth Amendment claims must under *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), but instead [at most] described a constitutionally noncognizable instance of medical malpractice." Neitzke v. Williams, 490 U.S. 319, 321-22 (1989) (internal brackets, parallel citations, and quotation marks omitted). By way of background, "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his . . . medical care, . . . it transgresses the substantive limits on state action set by the Eighth Amendment . . . ." DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 200 (1989). To state such a claim, Plaintiff must allege facts showing that Defendant Guin "acted with 'deliberate indifference' (subjective) to [his] 'serious medical needs' (objective)." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (quoting Estelle, 429 U.S. at 104).

For the objective component, a medical need qualifies as serious if it "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. (internal quotation marks omitted). In turn, "[t]he subjective component . . . sets a particularly high bar to recovery," id., as "deliberate indifference entails something more than mere

negligence, . . . [albeit] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result," Farmer v. Brennan, 511 U.S. 825, 835 (1994). More particularly, "[t]o establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990), overruled in part on other grounds, Farmer, 511 U.S. at 836-38; see also Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) ("Disagreements between an inmate and a physician over the inmate's proper medical care do not state a [Section] 1983 claim unless exceptional circumstances are alleged.").

Put another way, "[t]o prove deliberate indifference, [P]laintiff[] must show that '[Defendant Guin] knew of and disregarded an excessive risk to [his] health . . . .'" Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) (internal brackets omitted) (quoting Farmer, 511 U.S. at 837). Plaintiff can meet that burden by establishing that Defendant Guin failed to respond to a substantial health risk of which she "knew . . . from the very fact that the risk was obvious." Id. at 226 (internal quotation marks omitted); see also id. ("[F]ailure to respond to an inmate's known medical needs raises an inference of deliberate indifference to those needs." (internal brackets and quotation marks omitted)).

The Proposed Amended Complaint's allegations about Plaintiff's interaction with Defendant Guin do not show that she "knew of and disregarded an excessive risk to [his] health," id. at 225 (internal brackets and quotation marks omitted), including because those allegations establish no failure to respond to a substantial health "risk [that] was obvious," id. at 226 (internal quotation marks omitted), and no "failure to respond to an[y ] known medical needs," id. (internal brackets and quotation marks omitted).

Regarding the objective element, the Proposed Amended Complaint alleges that Plaintiff "had been choked and had a throat lump, pain, and difficulty breathing and swallowing." (Docket Entry 15-1 at 4.) To the extent Plaintiff's report of those matters placed Defendant Guin on notice of any "serious medical needs," Iko, 535 F.3d at 241 (internal quotation marks omitted), this claim falls short on the subjective element for want of allegations establishing that her responsive "treatment [was] so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness," Miltier, 896 F.2d at 851. Indeed, Plaintiff's allegations confirm that – in reasonable response to his reported symptoms, including the most self-evidently urgent, i.e., "difficulty breathing" (Docket Entry 15-1 at 4) – Defendant Guin (A) "took [his] vital signs" (id.),[5]

5 Vital signs generally include measurements pertinent to reported breathing trouble. See, e.g., Johnson v. Adams, No. 5:22CV2129, 2024 WL 4486619, at *8 (D.S.C. July 30, 2024) (continued...)

which "were normal" (id.), (B) examined him sufficiently to determine he had suffered "no visible injuries" (id.; see also id. (declining to allege any failure by "[Defendant] Guin [to] touch[] or examine[ Plaintiff's] throat")), and (C) "advised non-aspirin and ibuprofen and a sick-call request rather than arranging further urgent evaluation" (id.).

Based on those allegations, "even assuming that Plaintiff had a serious medical need, there is an absence of [facts showing] that Defendant [Guin] knew that Plaintiff faced a substantial risk of serious harm, and then disregarded that risk by failing to take reasonable steps to abate it." Perry v. McFarland, No. C 10-2882, 2011 WL 5295308, at *3 (N.D. Cal. Nov. 3, 2011) (unpublished). To that end, Defendant Guin, "a [licensed n]urse[, ] determined that Plaintiff's vital signs were normal. Thus, there is an absence of [facts showing] that Plaintiff was facing a substantial risk of serious harm, as well as an absence of [facts showing] that Defendant [Guin] failed to take reasonable steps to abate it." Id. (internal citation omitted); see also Phillips v. Roane Cnty., 534

---

5(...continued)
(unpublished) (describing "vital signs" as "including [] blood pressure and oxygen levels"), recommendation adopted, 2024 WL 4297644 (D.S.C. Sept. 26, 2024) (unpublished), aff'd, No. 24-7009, 2026 WL 624616 (4th Cir. Mar. 4, 2026) (unpublished); Williamson v. Steele, No. 4:12CV1548, 2015 WL 3620607, at *3 (E.D. Mo. June 9, 2015) (unpublished) (describing "vital signs" as including "blood pressure, heart rate, respiratory rate, . . . [and] oxygen saturation"). In line with that understanding, Defendant Guin's record of her examination of Plaintiff (which he appended to the Proposed Amended Complaint) documents his "Pulse," "Respirations," "Blood Pressure," and "SpO2." (Docket Entry 15-1 at 49.)

F.3d 531, 543 (6th Cir. 2008) (concluding that the estate of the decedent-inmate "failed to allege that [the defendant] had knowledge of [the decedent-inmate's] serious need for medical attention" where her "vital signs were within normal limits" (internal quotation marks omitted)). Moreover, contrary to Plaintiff's conclusory assertion that Defendant Guin simply "dismiss[ed his] symptoms based on normal vital signs and direct[ed him to make a] routine sick call without adequate further . . . treatment" (Docket Entry 15-1 at 11), Plaintiff has admitted that Defendant Guin also "advised non-aspirin and ibuprofen" (id. at 4), a reasonable first course of treatment given that his "normal vital signs [were] suggestive of less-than-severe pain and his lack of trauma [w]as indicative of a less serious injury," Spikes v. Wheat, 141 F.4th 662, 670 (5th Cir. 2025); see also, e.g., Dingle v. Palmer, No. 9:23CV6106, 2024 WL 5507520, at *10 (D.S.C. Dec. 20, 2024) (unpublished) ("To the extent [the p]laintiff complains that ibuprofen was not sufficient for his pain, such that [the d]efendant[-nurse]'s choice of treatment was incorrect or insufficient, it is well-settled that a disagreement over the proper course of medical care falls short of showing deliberate indifference." (internal citation omitted)), recommendation adopted, 2025 WL 750252 (D.S.C. Mar. 10, 2025) (unpublished).[6]

6 Although the Proposed Amended Complaint grouses about Defendant Guin's initial treatment plan "leaving [Plaintiff] with continuing pain and breathing and swallowing difficulty" (Docket (continued...)

Ultimately, Plaintiff has asserted that Defendant Guin subjected him to cruel and unusual punishment by failing to afford him some unspecified, "further evaluation or treatment" (Docket Entry 15-1 at 11). The Court should dismiss that claim because, as the Supreme Court explained in the case in which it first recognized a claim under the Eighth Amendment for deliberate indifference to an inmate's serious medical needs:

> [T]he question whether an[y] . . . additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order [additional diagnostic] measures[ or treatment] does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court . . . .

Estelle, 429 U.S. at 107.[7]

---

6(...continued)
Entry 15-1 at 4; see also id. at 11 (complaining of "prolonged pain and distress")), Plaintiff failed to identify any other treatment that would have provided greater relief (see id. at 4, 11; see also id. at 5 (alleging that "[Plaintiff] believes he submitted a sick-call request but does not recall any response" while declining to allege "that [any such] request was deliberately ignored")). That failure further supports dismissal of this claim. See, e.g., Strain v. Regaldo, 977 F.3d 984, 994 (10th Cir. 2020) (citing "fail[ure] to allege what other treatment [the d]efendants should have provided or how transferring [the inmate] to a hospital would have produced a better outcome" in affirming dismissal of claim for deliberate indifference); Jones v. Corbitt, No. 2:09CV367, 2011 WL 6300945, at *10 (M.D. Ala. Dec. 15, 2011) (unpublished) ("Although [the plaintiff] asserts he should have been provided a different treatment regimen . . . – a regimen he does not identify – this purely conclusory and suppositious assertion clearly fails to establish deliberate indifference.").

7 Plaintiff also appears to have improperly joined this claim against Defendant Guin with his factually and legally distinct claims against the other Defendants. See, e.g., Wendt v. Bullard, No. 5:23CT3047, 2024 WL 3955458, at *7 (E.D.N.C. Aug. 27, 2024) (continued...)

## Conversion Claim

The Proposed Amended Complaint also asserts a claim under North Carolina law for "[c]onversion against [Defendant] Carroll" (Docket Entry 15-1 at 12), for "intentionally exercis[ing] unauthorized control by withholding [Plaintiff's] property from [his] transfer [to Johnston Correctional Institution] despite Plaintiff's request and asserted right to retain it, excluding Plaintiff from possession" (id.). Plaintiff tendered these factual allegations as support for that conversion claim:

1) on the morning of "Plaintiff['s ] transfer[] from Piedmont [Correctional Institution] to Johnston [Correctional Institution]"

---

7(...continued)
(unpublished) (discussing Federal Rule of Civil Procedure 20(a)(2) and deeming proposed addition of claims improper where they arose from incident that "occurred at a different prison, [they] are alleged against different defendants employed at that facility, and they involve distinct factual issues"). Furthermore, because Plaintiff's claim against Defendant Guin for deprivation of medical care not only differed in type, but also arose at a different time and place, from his original claims against Defendants Carroll and Waller, Plaintiff's claim against Defendant Guin does not relate back to the filing date of the Complaint. See United States v. Pittman, 209 F.3d 314, 318 (4th Cir. 2000) (ruling that, under Federal Rule of Civil Procedure 15(c)(2), "new claims do not relate back to [the plaintiff's] original claims [when] they arise from separate occurrences of both time and type" (internal quotation marks omitted)). Accordingly, when Plaintiff signed the Proposed Amended Complaint on October 7, 2026 (see Docket Entry 15-1 at 16), the limitations period applicable to his claim under Section 1983 against Defendant Guin based on her actions on March 10, 2023, long since had expired (on March 10, 2026), see Tommy Davis Constr., Inc. v. Cape Fear Pub. Util. Auth., 807 F.3d 62, 67 (4th Cir. 2015) (re-affirming "conclu[sion] that [Section] 1983 claims [for federal constitutional violations] arising in North Carolina are limited by the three-year period for personal injury actions set forth in [North Carolina General Statutes, Section] 1-52(5)" (internal quotation marks omitted)).

(id. at 2), "[h]e had five inventoried property bags, primarily legal materials" (id.);

2) "[an o]fficer [] told [Plaintiff] they were permitted" (id.), but "[Defendant] Carroll insisted on three bags" (id.; see also id. at 5 (referring to appended "property-policy excerpts [that] allow exceptions [to property bag limits] for pending legal materials and medical equipment"));[8]

---

8 The above-referenced excerpts – from a document with a heading of "Offender Personal Property" (Docket Entry 15-1 at 77-78 (italics omitted)) – state, in pertinent part, as follows:

> Offenders are normally restricted to possession of three standard transfer bags of personal property. When offenders accumulate in excess of three bags of personal property, they are required to mail out or dispose of property in accordance with [another s]ection [] of this policy and the following statements: Offenders may be allowed to possess in excess of three bags of personal property based on medical equipment such as a special mattress or a breathing machine. They are also allowed to possess legal materials in excess of the three bag limit if the legal materials are relevant to pending matters before the courts. In these cases, efforts should be made to limit the offender's other personal property to essential hygiene items and religious materials/items in an effort to comply with the three bag limit. Questionable cases, regarding excess legal materials, should be referred to the Region Director who will consult with [the Department of Adult Correction's] General Counsel. As stated in [another s]ection [of this policy], if an offender is not allowed to maintain possession of legal materials, they are to be stored at the facility. Offenders are to be given access to their materials if their request does not threaten security. An offender being allowed to possess in excess of three bags of personal property will not be transported by special vehicle for that reason. This offender may be transported on the transfer bus.

(Id. at 77-78.)

3) another officer "authorized an attempt to repack [Plaintiff's five bags] into four, but [Defendant] Carroll did not allow a reasonable opportunity to do so" (id. at 2);

4) "[Plaintiff] asked about property [Defendant] Carroll was leaving behind and sought [Defendant] Waller's help" (id. at 3);

5) in response, "[Defendant] Carroll cursed[ at] Plaintiff" (id.), subjected him to a "racial insult" (id.), "grabbed [him] by the neck, choked him, and dragged him by the neck into the van [for transport to Johnston Correctional Institution]" (id.);

6) "[Defendant] Carroll deliberately refused to transport part of Plaintiff's property, including legal mail and federal-case papers, stamps, canteen and hygiene items, and family photographs" (id. at 5; see also id. ("[Defendant] Carroll's own statement acknowledges two bags of legal papers, another with medical items, and deliberately leaving a canteen bag behind."));[9]

---

9 The above-referenced statement from Defendant Carroll (which Plaintiff appended to the Proposed Amended Complaint) states, in pertinent part, as follows:

> [Plaintiff] had 5 shipping bags. I told [him] that he had too many bags to ship with and brought the policy to show [him]. . . . [Plaintiff] had two bags of legal papers and another with medical items. [Plaintiff] was told that he would be allowed only 4 bags. When we entered the sally port . . ., [Plaintiff] still had 5 bags of property and argued that he only had 4. We loaded 4 bags of property onto the van and he was told his bag containing canteen would be left behind. [Plaintiff] was told he could mail the extra property home, which he refused.

(Docket Entry 15-1 at 92.)

7) "Plaintiff did not abandon [that property] or consent to donation or destruction" (id.);

8) "[Plaintiff's property] was not returned despite requests and repeated calls to Piedmont [Correctional Institution] that Plaintiff observed [an officer at Johnston Correctional Institution] make" (id.); and

9) an inmate at Piedmont Correctional Institution "told Plaintiff that . . . [the inmate] saw [Plaintiff's] property in a captain's office for a long period, asked staff to send it, and eventually no longer saw it there" (id. at 6).

Those allegations do not "plausibly allege facts that, if proven, would be sufficient to establish each element of [this] claim," Harvey, 48 F.4th at 269 (emphasis added). In that regard, the United States Court of Appeals for the Fourth Circuit has held that, "under North Carolina law," Robinson v. Priority Auto. Huntersville, Inc., 70 F.4th 776, 785 (4th Cir. 2023), "'[t]here are, in effect, two essential elements of a conversion claim: [1] ownership in the plaintiff and [2] wrongful possession or conversion by the defendant,'" id. (emphasis added) (quoting Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs, LLC, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012)); see also, e.g., Edmondson v. American Motorcycle Ass'n, Inc., 7 F. App'x 136, 148 (4th Cir. 2001) (observing that, in North Carolina, "a claim for conversion [arises] under [the State's] common law"). As to that

second element, the Fourth Circuit further has held that "[w]rongful possession or conversion in this context means 'an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights.'" Robinson, 70 F.4th at 785 (emphasis added) (quoting Peed v. Burleson's, Inc., 244 N.C. 437, 439, 94 S.E.2d 351, 353 (1956)). The above-quoted allegations do not "suffic[e] to establish [that second] element," Harvey, 48 F.4th at 269, because they do not "plausibly allege," id., (A) Defendant Carroll's "assumption and exercise of the right of ownership over [Plaintiff's untransported property bag]," Robinson, 70 F.4th at 785 (internal quotation marks omitted), much less (B) such an "assumption and exercise . . . to the alteration of [that bag's] condition or the exclusion of [Plaintiff's] rights," id. (internal quotation marks omitted).

Concerning point (A), Plaintiff has alleged that, in loading the transfer van, "[Defendant] Carroll was leaving behind [Plaintiff's fifth bag]" (Docket Entry 15-1 at 3) and that "[Defendant] Carroll deliberately refused to transport [that] part of Plaintiff's property" (id. at 5). Plainly stated, Defendant Carroll's alleged failure to place that bag on the van, i.e., the "refus[al] to transport [that bag]" (id. at 5) in favor of "leaving [it] behind" (id. at 3), does not equate to an "assumption and exercise of the right of ownership over [that bag]," Robinson, 70

F.4th at 785 (emphasis added) (internal quotation marks omitted). See, e.g., Romano v. John Hancock Life Ins. Co. (USA), 120 F.4th 729, 741 (11th Cir. 2024) ("In general, 'ownership' is defined as the 'bundle of rights allowing one to use, manage, and enjoy property, including the right to convey it to others.'" (quoting Black's Law Dictionary 1329 (12th ed. 2024))); In re Philadelphia Ent. & Dev. Partners, LP, 623 B.R. 114, 120 (E.D. Pa. 2020) (observing that "'Ownership' is defined by its 'common and approved usage' . . . as 'the right to possess a thing'" (quoting Black's Law Dictionary Pocket Edition (5th ed. 2016))), aff'd, 860 F. App'x 25 (3d Cir. 2021); see also Kinsale Ins. Co. v. Pride of St. Lucie Lodge 1189, Inc., 135 F.4th 961, 970 n.2 (11th Cir. 2025) (collecting cases showing that "federal circuit courts of appeal [] regularly rely on dictionary definitions to determine the plain meaning of words in state common law").[10]

---

10 Plaintiff effectively has alleged that Defendant Carroll declined to act as a common carrier or bailee for the bag in question. See Williams v. Southern Ry. Co., 155 N.C. 260, 274-75, 71 S.E. 346, 352 (1911) (explaining that, "if [a] trunk was delivered [by Party A] and accepted by [Party B] . . . for transportation on the following morning, and it was customary to receive baggage for transportation in that way . . ., [Party B] would take [the trunk] as [a] common carrier[] . . ., but if no such custom existed and the trunk was only received for storage for one intending to become a passenger, . . . [Party B] is ordinarily regarded as [a] bailee"). Consistent with that view of Defendant Carroll's conduct, two witness statements Plaintiff appended to the Proposed Amended Complaint aver that Defendant Carroll "neglected [Plaintiff's] property by leaving it behind" (Docket Entry 15-1 at 95, 96 (emphasis added)). No reasonable person would say that someone who "neglected [another's] property" (id.) thereby "assum[ed] and exercise[d ] the right of ownership over [it]," Robinson, 70 F.4th at 785 (internal quotation marks omitted).

And, even if Defendant Carroll's alleged conduct somehow constituted an "assumption and exercise of the right of ownership over [the bag in question]," Robinson, 70 F.4th at 785 (internal quotation marks omitted), Plaintiff has not "plausibly allege[d]," Harvey, 48 F.4th at 269, that any such "assumption and exercise," Robinson, 70 F.4th at 785 (internal quotation marks omitted), effected "the alteration of [that bag's] condition or the exclusion of [Plaintiff's] rights," id. (internal quotation marks omitted). In fact, Plaintiff's allegations about that bag (quoted above) do not make any reference to "alteration of [its] condition," id. (internal quotation marks omitted)). (See Docket Entry 15-1 at 2-6, 12.) Conversely, the Proposed Amended Complaint does allege in conclusory fashion that Defendant Carroll's conduct "exclud[ed] Plaintiff from possession [of that bag]" (id. at 12), but the Proposed Amended Complaint does not allege facts establishing that "[his] rights," Robinson, 70 F.4th at 785 (internal quotation marks omitted), included transportation of that bag on the transfer van or immediate access to that bag upon his arrival at Johnston Correctional Institution (see Docket Entry 15-1 at 2-6, 12).

For starters, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 285 (1948). "Indeed, at common law a convicted felon . . . forfeited all rights to personal

property." Washlefske v. Winston, 234 F.3d 179, 185 (4th Cir. 2000) (emphasis added). Upon North Carolina's founding, "the people adopted all such parts of the English common law not inconsistent with the freedom and independence of North Carolina nor otherwise abrogated, repealed, or obsolete." North Carolina v. Tirado, 387 N.C. 104, 119, 911 S.E.2d 51, 63 (2025) (internal brackets, ellipses, and quotation marks omitted); see also id. at 119 n.9, 911 S.E.2d at 63 n.9 ("The English common law had been declared in force by North Carolina's colonial government."). "This declaration [adopting the common law] remains a part of [North Carolina] law, being codified, with amendments in [the North Carolina] General Statutes." Id. at 119 n.9, 911 S.E.2d at 63 n.9 (citing N.C. Gen. Stat. § 4-1).

"Thus, under traditional rules of property law in [North Carolina], an inmate has no property interest . . . in prison except insofar as the State might elect, through statute, to give [such] rights." Washlefske, 234 F.3d at 185 (emphasis added); see also Ebersole v. United States, Civ. Action No. 08-148, 2009 WL 604952, at *6 (D. Md. Feb. 25, 2009) (unpublished) ("It is well established that the property rights of prison inmates are limited."). By statute, North Carolina has delegated to the state prison administrative body the authority to "adopt rules and regulations related to the . . . rights and privileges of persons in its custody . . . ." N.C. Gen. Stat. § 143B-1452(a); see also

Bannan v. Angelone, 962 F. Supp. 71, 73-74 (W.D. Va. 1996) ("Prison administrators have broad discretion in the management of correctional institutions. Unless other rights such as religion or speech are involved, [prisons] may thus constitutionally disallow the possession of personal property." (internal citation omitted)). In implicit recognition of that fact, the Proposed Amended Complaint points to (and appends) certain "property-policy excerpts" (Docket Entry 15-1 at 5; see also id. at 77-78 (consisting of two pages of seven-page document dated "August 19, 2020" and labeled "Offender Personal Property" (italics omitted))).

Assuming for present purposes that those excerpts accurately set out applicable "rules and regulations related to the . . . rights and privileges of persons in [North Carolina state prison]," N.C. Gen. Stat. § 143B-1452(a), they do not establish that Plaintiff's personal property rights granted by the State of North Carolina entitled him to "possession" (Docket Entry 15-1 at 12), of the property bag in question on the transfer van or immediately upon his arrival at Johnston Correctional Institution (see id. at 77-78). Most significantly, the Offender Personal Property policy states that "[o]ffenders are normally restricted to possession of three standard transfer bags of personal property." (Id. at 77 (emphasis added).) Plaintiff admittedly "had five inventoried property bags . . . ." (Id. at 2 (emphasis added).) Under the Offender Personal Property policy, at the time Plaintiff

"accumulate[d] in excess of three bags of personal property, [he was] required to mail out or dispose of [his excess] property in accordance with Section F.0504 of th[e Offender Personal Property] policy" (id. at 77 (emphasis added)),[11] subject to these caveats:

> Offenders may be allowed to possess in excess of three bags of personal property based on medical equipment such as a special mattress or a breathing machine. They are also allowed to possess legal materials in excess of the three bag limit if the legal materials are relevant to pending matters before the courts. In these cases, efforts should be made to limit the offender's other personal property to essential hygiene items and religious materials/items in an effort to comply with the three bag limit.

(Id. (emphasis added).)

Careful consideration of those caveats reveals at least three reasons why Plaintiff remained bound by the "require[ment] to mail out or dispose of [his excess] property" (id.), and therefore lacked the right to possess five property bags on the transfer van. First, by using the word "may" (id.) in reference to allowances for "medical equipment" (id.), the Offender Personal Property policy creates no entitlement to possession of more than three bags of personal property. See, e.g., Kingdomware Techs., Inc. v. United

---

11 The above-cross-referenced section of the Offender Personal Property policy, entitled "Disposition of Unauthorized Items" (Docket Entry 15-1 at 78 (all-caps and enlarged font omitted)), requires excess (and thus prohibited) personal property's "mail[ing] at the offender's expense to an addressee designated by the offender" (id.) or, "if the offender is without funds, . . . with mailing costs paid from the Inmate Welfare Fund" (id.; see also id. ("If the offender is unwilling or unable to designate an addressee to whom the prohibited property may be sent, the prohibited items will be donated to a charitable organization or otherwise disposed of as surplus property.")).

States, 579 U.S. 162, 171 (2016) (observing that "word 'may' . . . implies discretion"); Lovo v. Miller, 107 F.4th 199, 213 (4th Cir. 2024) (holding that use of word "may" in regulation "offers a clear indication that [government agency] is not mandated to do so[mething]" (emphasis and internal quotation marks omitted)). Second, the Offender Personal Property policy does not exempt all legal materials from "the three bag limit" (Docket Entry 15-1 at 77); instead, it exempts only "legal materials [that] are relevant to pending matters before the courts" (id.). The Proposed Amended Complaint, however, merely alleges that the "[un]transport[ed] part of Plaintiff's property[] includ[ed] legal mail and federal-case papers" (id. at 5), without alleging any facts to show that those "legal materials [remained] relevant to pending matters before the courts" (id. at 77 (emphasis added)). (See id. at 5.) Third, Plaintiff's allegations establish that he failed to make the required "efforts . . . to limit [his] other personal property [beyond legal materials] to essential hygiene items and religious materials/items in an effort to comply with the three bag limit" (id. at 77 (emphasis added)). (See id. at 5 (conceding that "[un]transport[ed] part of Plaintiff's property[] includ[ed] . . . stamps, canteen . . . items, and family photographs").)[12]

---

12 Additionally, although the Proposed Amended Complaint alleges that the "[un]transport[ed] part of Plaintiff's property[] includ[ed] . . . hygiene items" (Docket Entry 15-1 at 5), it does not allege facts showing that those items constituted "essential hygiene items" (id. at 77 (emphasis added)). (See id. at 5.)

In sum, to the extent Defendant Carroll's refusal to place Plaintiff's fifth property bag on the transfer van constituted an "assumption and exercise of the right of ownership over [that bag]," Robinson, 70 F.4th at 785 (internal quotation marks omitted), which "exclud[ed] Plaintiff from possession" (Docket Entry 15-1 at 12), that exclusion did not qualify as an "exclusion of [Plaintiff's] rights," Robinson, 70 F.4th at 785 (emphasis added) (internal quotation marks omitted), as Plaintiff lacked any property right entitling him to transportation of that bag to Johnston Correctional Institution (and/or immediate possession of that bag when he arrived).[13] As a result, the Proposed Amended

---

13 At best, under the Offender Personal Property policy, Plaintiff's demand for transportation of his fifth property bag presented a "[q]uestionable case[] regarding excess legal materials, [which] should [have] be[en] referred to the Region Director . . . [for] consult[ation] with [the Department of Adult Correction's] General Counsel." (Docket Entry 15-1 at 77-78.) That process obviously would have extended beyond the time reasonably allotted to load the transfer van at Piedmont Correctional Institution in the early morning hours of March 10, 2023, and thus those excess legal materials "[we]re to be stored at the facility" (id. at 78), which (per the Proposed Amended Complaint) indeed happened (see id. at 6 (alleging that another inmate at Piedmont Correctional Institution "later told Plaintiff that . . . [the inmate] saw [Plaintiff's] property [bag] in a captain's office for a long period")). Notably, the Proposed Amended Complaint does not allege any facts showing that Defendant Carroll bears responsibility for any failure (A) to obtain a determination from the Region Director about Plaintiff's entitlement to keep those excess legal materials or (B) to provide Plaintiff with access to them in response to "requests and repeated calls to Piedmont [Correctional Institution] that Plaintiff observed [an official at Johnston Correctional Institution] make" (id. at 5). (See id. at 5-6; see also id. at 12 ("[Plaintiff] does not allege that [Defendant] Carroll personally committed a later destruction that Plaintiff did not witness . . . .").)

Complaint does not "plausibly allege facts that, if proven, would be sufficient to establish [the second] element of [Plaintiff's conversion] claim," Harvey, 48 F.4th at 269. "[Because P]laintiff fail[ed] to plead a required element [of t]his claim . . ., the appropriate remedy is dismissal for failure to state a claim." Brunson, 116 F.4th at 307.

Obstruction Claim(s)

As noted in the Introduction, Plaintiff initiated this action against not only Defendants Carroll and Waller but also Defendants Anderson and Turner. (See Docket Entry 2 at 2-3.) The Complaint did not make clear what claim(s) Plaintiff asserted against Defendants Anderson and Turner, but appeared to allege that they "deliberately used their authorities to undermine investigations and, or, spoil inculpatory evidence against [Defendant] Carroll." (Id. at 4 (internal quotation marks omitted).) Plaintiff's Supporting Affidavit (Docket Entry 3), which he filed along with the Complaint (see Docket Entry 2 at 5 (incorporating "Plaintiff's Supporting Affidavit" as showing of "facts underlying [his] claim(s)")), clarified that apparent claim by alleging that Defendants Anderson and Turner – Piedmont Correctional Institution's "Warden" (Docket Entry 3 at 8) and the "official assigned to investigate [Defendant Carroll's] use of force" (id.), respectively – "took it upon themselves to destroy the key piece of evidence that displayed [Defendant] Carroll's violence against

[Plaintiff], . . . camera footage" (id. (internal quotation marks omitted); see also id. at 6 ("The assaults of [Defendant] Carroll were . . . captured under they [sic] eye of the camera located in [Piedmont Correctional Institution's] vehicle sallyport." (internal quotation marks omitted))).

The Court (per now-Chief Judge Bragdon) subsequently ordered as follows regarding that claim:

> [T]he North Carolina common law offense of obstruction of justice prevents "any act which prevents, obstructs, impedes or hinders public or legal justice." If [Defendants] Anderson and [] Turner intentionally destroyed camera footage of the incident, that would impede and hinder this action. Therefore, [Plaintiff's] individual capacity claims against [Defendants] Anderson and [] Turner [for obstruction of justice] should be allowed to proceed.

(Docket Entry 6 at 1-2 (emphasis added) (italics and internal citation omitted) (quoting Blackburn v. Carbone, 208 N.C. App. 519, 526, 703 S.E.2d 788, 794 (2010), appeal dismissed, 365 N.C. 194, 710 S.E.2d 52 (2011)).)

The Proposed Amended Complaint "maintains the individual-capacity claims against [Defendants] Turner and Anderson allowed to proceed in [the above-quoted Order] and seeks to add [Defendants] Fordham and Warnic on this same state-law theory." (Docket Entry 15-1 at 13; see also id. at 2 (identifying "[Defendant] Fordham []as Associate Warden and [Defendant] Warnic [as] captain involved in the incident notification and review process").) However, the Proposed Amended Complaint abandons the Complaint's allegation that

Defendants Anderson and Turner "took it upon themselves to destroy . . . camera footage" (Docket Entry 3 at 8) and now purports to state a claim against them for "knowingly fail[ing] to secure relevant sallyport recordings and intentionally allow[ing] their loss or destruction to hinder Plaintiff in proving the assault [by Defendant Carroll]" (Docket Entry 15-1 at 13). Similarly, the Proposed Amended Complaint purportedly states a claim against Defendants Fordham and Warnic not for "intentionally destroy[ing] camera footage of the incident" (Docket Entry 6 at 2), but instead for "knowingly participat[ing] in failing to secure and preserve th[at video] evidence despite its relevance to the reported assault" (Docket Entry 15-1 at 13).

In support of those claim(s), the Proposed Amended Complaint recites these factual allegations:

1) "Plaintiff saw cameras above the sallyport and believes they were operating" (id. at 6; see also id. (conceding that Plaintiff "did not see a live feed or recording"));

2) "[Plaintiff] asked [officials at Johnston Correctional Institution] on March 10[, 2023] to preserve and review footage" (id.) and "[t]hey said they would relay the information to Piedmont [Correctional Institution]" (id.; see also id. at 6-7 (conceding that "[Plaintiff] has no confirmation of the relay to Piedmont [Correctional Institution]"));

3) "Plaintiff called his sister . . . after arriving at Johnston [Correctional Institution]" (id. at 7) and "[s]he told [Plaintiff] she spoke with [Defendant] Anderson that day and that [he] promised investigation and preservation of evidence" (id.);

4) "[an] Incident Report [] identifies [Defendant] Turner as [the] investigating officer [regarding Defendant Carroll's alleged use of force on Plaintiff]" (id. (referring to id. at 33));

5) that Incident Report "records notification to [Defendant] Warnic at 10:50 a.m., [Defendant] Fordham at 11:00 a.m., and [Defendant] Anderson at 11:48 a.m.[, all] on March 10[, 2023]" (id. at 7 (referring to id. at 35); see also id. at 36 (identifying Defendant Warnic as "Reviewing Auth" who deemed "Invest Complete" on March 21, 2023 (all-caps font omitted)));

6) "[Defendant] Anderson's March 30[, 2023] entry [on that Incident Report] states there was no video and refers to an OIA referral and administrative investigation" (id. at 7 (referring to id. at 35); see also id. at 36 (noting "consultation" with Defendant Anderson on March 30, 2023 (all-caps font omitted)));

7) "Plaintiff's April 24[, 2023] grievance" (id. at 8 (referring to id. at 54-59)) "requests video review" (id. at 8; see also id. at 59 ("I am requesting for [sic] the camera footage of the incident between the hour of 4:00 to 6:30 be reviewed."));

8) "[Defendant] Fordham's May 26[, 2023] Step Two response [to Plaintiff's grievance] adopts [Defendant Turner's] Step One

[response to Plaintiff's grievance] and [Defendant Anderson's findings from an administrative] investigation" (id. at 8 (referring to id. at 60-61));[14]

9) "[on] April 30, 2025[, in] response [to an order in a North Carolina Industrial Commission case brought by Plaintiff about the same incident as this case]" (id. at 8), the Department of Adult Correction "state[d] it possessed no relevant sallyport or intake video and that no video had been burned to a disk and retained in the investigation file" (id. (referring to id. at 80)); and

10) "Plaintiff relies on [appended] August 30, 2018 policy excerpts addressing . . . relevant video review[] and master-video retention" (id. at 8 (referring to id. at 70-72)).[15]

---

14 In that Step One response – which finds that Plaintiff's "grievance [for lost legal documents and headaches] ha[d] no merit" (Docket Entry 15-1 at 60) – Defendant Turner noted (A) that the "grievance . . . claim[s] that [Defendant Carroll] would not allow [Plaintiff] to take legal documents, but in [his] original statement (which was written on 03/10/2023) [he] stated [Defendant Carroll] would not allow [him] to take [his] canteen [items]" (id. (missing parenthesis supplied); see also id. (documenting that officer-in-charge at time of transfer reported that Plaintiff "never said anything about pending legal cases")), and (B) that Defendant Guin found Plaintiff's "vitals were stable and there were no visible injuries" (id.). Defendant Fordham's above-referenced, Step Two response states: "[Defendant Turner's] Step [O]ne [response] adequately addresses [Plaintiff's] grievance request. An internal investigation was conducted and approved by the Western Region Office concurring with [Defendant Anderson's] findings which are in line with the [S]tep [O]ne [response]." (Id. at 61.)

15 The above-referenced policy excerpts include, within a section entitled ".1506 Reporting Procedures" (Docket Entry 15-1 at 70 (all-caps and enlarged font omitted)), these provisions: (1) "[e]ach correctional staff member involved in an incident requiring the use of force will immediately make a comprehensive (continued...)

The Court should dismiss this claim because Plaintiff's factual allegations do not establish anything "more than a sheer possibility that [ D]efendant[s Anderson, Turner, Fordham, and/or Warnic] ha[ve] acted unlawfully," Iqbal, 556 U.S. at 678, and thus "stop[] short of the line between possibility and plausibility of entitlement to relief," id. (internal quotation marks omitted). To begin (and as previously held by now-Chief Judge Bragdon in regard to the Complaint), "the North Carolina common law offense of obstruction of justice prevents 'any act which prevents, obstructs, impedes or hinders public or legal justice.'" (Docket Entry 6 at 1 (emphasis added) (italics omitted) (quoting Blackburn, 208 N.C. App. at 526, 703 S.E.2d at 794).) The North Carolina Supreme Court likewise has ruled that "acts which obstruct, impede or hinder public or legal justice [] would amount to the common law offense of obstructing public justice." Henry v. Deen, 310 N.C. 75, 87, 310 S.E.2d 326, 334 (1984) (emphasis added); see also In re Kivett, 309 N.C. 635, 670, 309 S.E.2d 442, 462 (1983) ("At common law it is an offense to do any act which prevents, obstructs, impedes or

---

15(...continued)
report to the Officer-In-Charge" (id.); (2) "[t]he Officer-In-Charge or designee will then investigate to determine whether the reports of the involved staff are accurate and complete" (id.); and (3) "[a]s part of the investigation, the Officer-In-Charge or designee shall . . . [r]eview any facility video that displays any part of the incident pursuant to section .1507 of this policy" (id.). The cross-referenced section .1507, which bears the title "Video Recording of Use of Force Incidents" (id. at 71 (all-caps and enlarged font omitted)), focuses on the "use [of] video cameras to record anticipated use of force incidents" (id. (emphasis added)). (See id. at 71-72.)

hinders public or legal justice." (emphasis added)). "As a result, any action intentionally undertaken by the defendant for the purpose of obstructing, impeding, or hindering the plaintiff's ability to seek and obtain a legal remedy will suffice to support a claim for common law obstruction of justice." Blackburn, 208 N.C. App. at 527, 703 S.E.2d at 795 (emphasis added); see also Henry, 310 N.C. at 88, 310 S.E.2d at 334-35 (endorsing "claim for the resulting increased costs of the investigation" where the defendant allegedly committed act(s) of "deliberately destroy[ing], alter[ing] or creat[ing] a false document to subvert [the plaintiff's] investigation of his right to seek a legal remedy").

Other decisions from the North Carolina Court of Appeals addressing claims for common law obstruction of justice also uniformly describe the tort as requiring the defendant's commission of an obstructive act/action. See, e.g., Grant v. High Point Reg'l Health Sys., 184 N.C. App. 250, 255-56, 645 S.E.2d 851, 855 (2007) ("[The p]laintiff . . . alleged . . . that [the d]efendant destroyed the medical records of decedent. [The p]laintiff alleged [the d]efendant's actions effectively precluded [the p]laintiff from obtaining the required [medical malpractice] certification. . . . We hold that such acts . . . 'would be acts which obstruct, impede or hinder public or legal justice . . . .' [The p]laintiff's complaint stated a cause of action for common law obstruction of justice." (emphasis added) (quoting Henry, 310 N.C.

at 87, 310 S.E.2d at 334)), disc. review allowed, 362 N.C. 234, 659 S.E.2d 441, disc. review ruled improvidently granted, 362 N.C. 502, 666 S.E.2d 757 (2008); Broughton v. McClatchy Newspapers, Inc., 161 N.C. App. 20, 33, 588 S.E.2d 20, 30 (2003) ("'It is an offense to do any act which prevents, obstructs, impedes or hinders public or legal justice.'" (emphasis added) (internal brackets omitted) (quoting Burgess v. Busby, 142 N.C. App. 393, 408-09, 544 S.E.2d 4, 12, appeal dismissed and disc. review granted, 353 N.C. 525, 549 S.E.2d 216, disc. review ruled improvidently granted, 354 N.C. 351, 553 S.E.2d 679 (2001))). "In other words, North Carolina law requires that the defendant acted with the specific intent to obstruct justice, [as well as] the general intent to do the act which resulted in the obstruction." Freeman v. Dal-Tile Corp., 750 F.3d 413, 425 (4th Cir. 2014) (emphasis added) (citing Blackburn, 208 N.C. App. at 527 & n.6, 703 S.E.2d at 795 & n.6); see also, e.g., Wall v. Gulledge, No. 1:22CV31, 2024 WL 4503823, at *11 (M.D.N.C. Oct. 16, 2024) (unpublished) (Osteen, J.) ("[T]o state a claim for common law obstruction of justice, a plaintiff must allege any action intentionally undertaken by the defendant for the purpose of obstructing, impeding, or hindering the plaintiff's ability to seek and obtain a legal remedy." (emphasis added) (internal quotation marks omitted)).

The Complaint (as explained by now-Chief Judge Bragdon) satisfied that obstructive-act/action requirement by alleging that

Defendants Anderson and Turner "intentionally destroyed camera footage" (Docket Entry 6 at 2 (emphasis added); see also Docket Entry 3 at 8 (alleging that Defendants Anderson and Turner "took it upon themselves to destroy . . . camera footage" (emphasis added))), but (as detailed previously) the Proposed Amended Complaint discards that allegation of an act (destroying camera footage) in favor of allegations of a failure to act, i.e., that (A) Defendants Anderson and Turner "knowingly failed to secure relevant sallyport recordings and intentionally allowed their loss or destruction" (Docket Entry 15-1 at 13 (emphasis added)), and (B) Defendants Fordham and Warnic "knowingly participated in failing to secure and preserve the same evidence" (id. (emphasis added)). Those allegations do not state a claim for obstruction of justice under North Carolina law because, as the North Carolina Supreme Court has said, "[f]ailure to act is not an act," Flynn v. North Carolina State Highway & Pub. Works Comm'n, 244 N.C. 617, 620, 94 S.E.2d 571, 573 (1956).

Rather, "[a]n 'act' is defined as 'something done or performed, esp. voluntary; a deed.'" Brook v. Rogers, 656 F. Supp. 3d 78, 87 (D.D.C. 2023) (internal brackets omitted) (quoting Black's Law Dictionary (11th ed. 2019)), aff'd sub nom., Doe v. Rodgers, No. 20-5297, 2023 WL 1978697 (D.C. Cir. Feb. 14, 2023) (unpublished); see also, e.g., Altman v. Nationwide Life Ins. Co., Civ. Action No. 98-3395, 1999 WL 269938, at *5 (E.D. Pa. Apr. 23,

1999) (unpublished) ("An act is defined as 'a thing done or being done.'" (quoting Webster's Third New Int'l Dictionary 20 (1986))); In re Lucre, Inc., 339 B.R. 648, 658 (Bankr. W.D. Mich. 2006) ("An 'act' is defined as 'the doing of a thing.'" (quoting Webster's Ninth New Collegiate Dictionary)), appeal dismissed, 471 F. Supp. 2d 845 (W.D. Mich. 2007).[16] In the same vein, the Fourth Circuit has provided this explication of the word "action," Blackburn, 208 N.C. App. at 527, 703 S.E.2d at 795:

> Black's Law Dictionary [has] defined 'action' as 'conduct; behavior; something done,' while Webster's Dictionary variously [has] defined it as 'a deliberative or authorized proceeding,' 'the process of doing,' and 'a thing done.' Those definitions each point to some affirmative conduct, not mere inaction or delay. And they align with the intuition that the definition of a word like 'action' would not typically include its logical opposite.

Lovo, 107 F.4th at 207 (emphasis added) (internal brackets and citations omitted) (quoting Black's Law Dictionary (6th ed. 1991) and Webster's Third New Int'l Dictionary (1993), respectively).

"Here, there are no allegations of affirmative conduct by [Defendants Anderson, Turner, Fordham, and Warnic]," Johnson v. City of Philadelphia, 975 F.3d 394, 401 (3d Cir. 2020) (emphasis added); just the opposite, "Plaintiff [has] allege[d] . . . that [they] knowingly failed to secure relevant recordings" (Docket Entry 15-1 at 9 (emphasis added)). "[T]his is a classic allegation

16 "[F]ederal circuit courts of appeal [] regularly rely on dictionary definitions to determine the plain meaning of words in state common law." Kinsale Ins., 135 F.4th at 970 n.2.

of omission, a failure to do something – in short, a claim of inaction and not action." Johnson, 975 F.3d at 401 (emphasis added); see also, e.g., T.Y. v. Shawnee Mission Sch. Dist. USD 512, No. 17-2589, 2018 WL 2722501, at *13 (D. Kan. June 6, 2018) (unpublished) ("Failing to act is not an affirmative act."); Morris v. Firemen's Ins. Co. of N.J., 247 P. 852, 854 (Kan. 1926) ("Omission of action is not action."). "That is not enough under [North Carolina] decisions, and so [the Court should order] . . . dismissal of th[is] claim." Johnson, 975 F.3d at 401.[17]

Alternatively, "Plaintiff has failed to sufficiently [allege facts showing] that [Defendants Anderson, Turner, Fordham, and Warnic] acted with the degree of deliberation and intentionality necessary to establish liability for common law obstruction of justice." Blackburn, 208 N.C. App. at 529 n.8, 703 S.E.2d at 796 n.8; see also Freeman, 750 F.3d at 425 (emphasizing that, under North Carolina common law, obstruction of justice "requires proof that the defendant acted willfully and with an intent to defraud,"

17 "This absence of analogous North Carolina case law is significant because, in construing the common law of a state, [federal courts] have declined to expand state common law principles to encompass novel circumstances when the courts of that state have not done so first." Fontenot v. TASER Int'l, Inc., 736 F.3d 318, 331 (4th Cir. 2013); see also, e.g., McDaniel v. John Crane, Inc., No. 1:19CV359, 2021 WL 1111154, at *15 (M.D.N.C. Mar. 23, 2021) (unpublished) (Osteen, J.) ("[F]ederal courts applying state laws should not create or expand a state's common law . . . ."). "This Court, therefore, [should] not extend the law . . . [but instead should] apply existing North Carolina law to [this] claim asserted by Plaintiff." Hutton v. Hydra-Tech, Inc., No. 1:14CV888, 2018 WL 1363842, at *3 (M.D.N.C. Mar. 15, 2018) (unpublished) (Biggs, J.) (internal quotation marks omitted).

i.e., "the specific intent to obstruct justice" (internal quotation marks omitted)). "Although Plaintiff has alleged that [Defendants Anderson's, Turner's, Fordham's, and Warnic's] conduct was intentional," Blackburn, 208 N.C. App. at 529 n.8, 703 S.E.2d at 796 n.8, those allegations constitute "legal conclusions, as opposed to facts," id., and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," Iqbal, 556 U.S. at 678.

The Proposed Amended Complaint attempts to paper over "the absence of any factual basis for Plaintiff's contentions concerning [Defendants Anderson's, Turner's, Fordham's, and Warnic's] mental state[s]," Blackburn, 208 N.C. App. at 529 n.8, 703 S.E.2d at 796 n.8, by asserting that "[t]heir assigned responsibilities support an inference that each knew the applicable preservation requirements" (Docket Entry 15-1 at 9; see also id. at 13-14 (alleging (A) that Defendants Anderson and Turner "intentionally allowed the[] loss or destruction [of video recordings] to hinder Plaintiff in proving the assault" by citing their "notice[ of the excessive force investigation and his] preservation requests, [as well as their] assigned roles[ and] policy duties" and (B) that Defendants Fordham and Warnic "each intentionally allowed evidence to become unavailable to shield [Defendant] Carroll and herself from ensuing liability" by citing "[t]heir knowledge of the preservation requirements" and "assigned responsibilities,

individual notice, review actions and omissions")). But even if the Court accepted that Defendants Anderson, Turner, Fordham, and Warnic knew of a policy requiring preservation of video recording(s) of the sallyport from the time-period of Defendant Carroll's alleged use of excessive force (and assumed that such recording(s) existed at the time they learned about that incident), the Proposed Amended Complaint does not plausibly allege facts "demonstrat[ing] that [their failures to act] were conscious or intentional rather than negligent," Rogers v. North Carolina Dep't of Pub. Safety, No. 1:19CV417, 2022 WL 3283990, at *5 n.5 (M.D.N.C. Aug. 11, 2022) (unpublished) (Webster, M.J.), recommendation adopted, 2022 WL 4472958 (M.D.N.C. Sept. 26, 2022) (unpublished) (Osteen, J.), aff'd sub nom., Rogers v. Rich, No. 22-7167, 2024 WL 1230147 (4th Cir. Mar. 22, 2024) (unpublished). (See Docket Entry 15-1 at 6-9, 13-14.)[18]

---

18 "For example, the [Proposed Amended Complaint] contains absolutely no indication that [Defendants Anderson, Turner, Fordham, or Warnic] received any benefit or avoided any detriment as the result of [neglecting to preserve any video recording]," Blackburn, 208 N.C. App. at 529, 703 S.E.2d at 796. (See Docket Entry 15-1 at 6-9, 13-14.) Nor can Plaintiff stave off dismissal for his failure to allege facts showing Defendants Anderson's, Turner's, Fordham's, or Warnic's "specific intent to obstruct justice," Freeman, 750 F.3d at 425, by simply asserting that their "actions are matters of discovery" (Docket Entry 15-1 at 9; see also id. ("Plaintiff seeks appropriate discovery concerning recordings, retention settings, camera operation, preservation requests, export logs, [and the internal] investigation . . . .")). Under the plausibility pleading standard, filing a complaint with "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do[es] not suffice," Iqbal, 556 U.S. at 678, and "does not unlock the doors of discovery (continued...)

In the end, viewing the Proposed Amended Complaint's allegations "in the light most favorable to Plaintiff, [he] has failed to allege . . . facts tending to show that [Defendants Anderson, Turner, Fordham, and Warnic] intentionally [allowed the loss of video recordings] . . . for the purpose of disrupting or obstructing [his excessive force] case." Blackburn, 208 N.C. App. at 529, 703 S.E.2d at 796. "As a result, . . . [the Court should

18(...continued)
for a plaintiff armed with nothing more than conclusions," id. at 678-79; see also, e.g., Johnson v. American Towers, LLC, 781 F.3d 693, 709 (4th Cir. 2015) ("affirm[ing]" dismissal of the plaintiffs' claims "due to the speculative nature of their allegations," which "suggest[ed] only a desire to conduct a fishing expedition to determine if there [wa]s any factual basis for asserting claims against any [of the de]fendants" (internal quotation marks omitted)); Guille v. Eldridge, No. 7:24CV786, 2026 WL 2855621, at *5 n.9 (W.D. Va. Sept. 22, 2026) (unpublished) ("Given the complete lack of facts alleged in the amended complaint [as to the defendant's mental state], discovery would be an impermissible fishing expedition to find a basis for a claim."); Sherman v. Equifax Info. Servs. LLC, No. 4:25CV13151, 2026 WL 2445396, at *3 (D.S.C. Aug. 20, 2026) (unpublished) ("[The p]laintiff's argument that allowing discovery will enable him to plausibly plead his claims likewise fails, as discovery is meant to find evidence for an already-stated claim, not to search for a claim itself."); Thomas v. McFadden, 810 F. Supp. 3d 732, 742 (W.D.N.C. 2025) ("[A] lawsuit cannot just be the means to pursue a fishing expedition into a potential claim."); Ogunsula v. Maryland State Police, Civ. Action No. 20-2568, 2022 WL 3290713, at *11 (D. Md. Aug. 11, 2022) (unpublished) ("[The plaintiff] has made a serious accusation[, but her] mere belief is not enough on which to proceed. It is well-settled that a lawsuit is not a fishing expedition, and sufficient allegations are required to enable a party to conduct discovery."); Feeley v. Total Realty Mgmt., 660 F. Supp. 2d 700, 715 (E.D. Va. 2009) ("Plaintiffs are required to possess sufficient information to state a claim when they commence litigation, so as to avoid fishing expeditions.").

dismiss] Plaintiff's common law obstruction of justice claim [on that basis] as well." Id. at 529-30, 703 S.E.2d at 796-97.[19]

CONCLUSION

At the time Plaintiff submitted the Proposed Amended Complaint, he could amend as of right under Federal Rule of Civil Procedure 15(a)(1); however, required screening under Section 1915(e)(2)(B) confirms that all but four of Plaintiff's claims in the Proposed Amended Complaint fail as a matter of law.

**IT IS THEREFORE RECOMMENDED** that the Court (A) deem the Proposed Amended Complaint as Plaintiff's operative pleading, (B) permit Plaintiff's claims under Section 1983 against Defendants Carroll and Waller for violations of the Eighth Amendment, as well as Plaintiff's related claims under North Carolina law against

---

19 Plaintiff's obstruction claim includes an "alleg[ation] upon information and belief that the deliberate failure to gather [certain prisoners'] eyewitness accounts formed part of the effort to hinder a complete evidentiary record." (Docket Entry 15-1 at 14; see also id. at 6 (alleging that two prisoners on transfer van "provided supporting accounts [about Defendant Carroll's use of excessive force]," that "four or five other prisoners were in the van and sallyport," and that Plaintiff "notified Johnston [Correctional Institution] staff of those witnesses" (referring to id. at 95, 96)), 14 ("Plaintiff does not allege destruction of statements known to have been written . . . .").) The Proposed Amended Complaint concedes that Plaintiff only included "[t]his allegation [to] suppl[y] context for the obstruction theory rather than [to state] an automatic independent tort for failure to interview." (Id. at 14.) In any event, based on the authority discussed above, any obstruction claim predicated on the alleged failure of Defendants Anderson, Turner, Fordham, and/or Warnic to interview those unidentified prisoners fails as a matter of law for (A) lack of any alleged "acts," Henry, 310 N.C. at 87, 310 S.E.2d at 334, and (B) lack of factual allegations showing "the[ir] specific intent to obstruct justice," Freeman, 750 F.3d at 425.

Defendant Carroll for assault and battery and for IIED, to proceed, (C) dismiss all of Plaintiff's other claims under Section 1915(e)(2)(B)(ii) for failure to state a claim, and (D) direct Defendants Carroll and Waller to file an amended answer to the Proposed Amended Complaint (as so limited).

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

November 23, 2026